**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 21-23578-CIV-MORENO/GOODMAN**

REGIONS BANK,

      *Plaintiff,*

v.

NBV LOAN ACQUISITION
MEMBER, LLC, et al.,

      *Defendants.*

_____/

**REPORT AND RECOMMENDATIONS ON COMPETING**
**SUMMARY JUDGMENT MOTIONS[1]**

_____

[1]    Defendants have recently filed a motion to strike the opinion of Plaintiff's expert, Barry Mukamal. [ECF No. 165]. This motion will be addressed in a separately issued Order after it is fully briefed.

Although a ruling on whether Mr. Mukamal will be permitted to offer his opinions at trial is currently pending and will not be issued until the motion is fully briefed, his testimony does not concern any of the dispositive issues which serve as a basis for the Undersigned's recommendations as to the competing summary judgment motions. Plaintiff does not meaningfully rely on Mukamal's opinions in support of its own summary judgment request, nor does it meaningfully rely on those opinions in support of its arguments in opposition to Defendants' summary judgment motion.

If anything, it is *Defendants* -- the parties seeking to exclude Mukamal's opinion -- who rely on Mukamal's expert report and deposition testimony in support of their affirmative summary judgment request, as well as to support their arguments in opposition to Plaintiff's summary judgment motion. Thus, if Defendants were to succeed in their motion to exclude Mukamal's testimony, then many of *their* arguments would no longer be supported by admissible evidence. Given this reality and the substance of this

Plaintiff Regions Bank ("Plaintiff" or "Regions"), the judgment creditor of non-party NBV Loan Acquisition LLC ("NBV Loan"), filed this fraudulent transfer and civil conspiracy lawsuit against six defendants related to NBV Loan: Allen Greenwald ("Allen"), Scott Greenwald ("Scott"), and Amy Greenwald ("Amy") (collectively, the "Greenwalds"), as well as NBV Loan Acquisition Member LLC ("NBV Member"), Billy's Creek Preserve LLC ("Billy's Creek"), and GFS, Corp. ("GFS") (collectively, the "Corporate Defendants"). [ECF No. 95]. Senior United States District Court Judge Federico A. Moreno referred to the Undersigned all pretrial matters for an Order on non-dispositive motions and for a Report and Recommendations on dispositive motions. [ECF No. 78].

Before the Undersigned are the parties' competing summary judgment motions. [ECF Nos. 132; 135]. Both motions are fully briefed with a response [ECF Nos. 145; 148] and a reply [ECF Nos. 156; 157]. By way of summary, Plaintiff seeks summary judgment on Counts I, XV, and XII, while Defendants argue that summary judgment is appropriate in their favor on all Counts.

As explained below, there are multiple bona fide disputes over material facts. Because of these factual disputes, the Undersigned **respectfully recommends** that the District Court **deny** both summary judgment motions.

---

Report and Recommendations, the Undersigned need not postpone issuance of this R & R until after Defendants' motion concerning Mr. Mukamal is resolved.

A.      **Factual Background**

Plaintiff and Defendants each submitted a statement of material facts. [ECF Nos. 133; 136]. Both parties also responded to the opposing party's statement of facts. [ECF Nos. 147; 149].

Plaintiff included in its response to Defendants' summary judgment motion "additional facts," as permitted by Southern District of Florida Local Rule 56.1(a)(2). Defendants failed to respond to Plaintiff's additional facts, as *required* by the Local Rules. *See* S.D. Fla. L.R. 56.1(a)(3) ("The movant *shall* respond to any additional facts asserted in the opponent's Statement of Material Facts even if the movant does not serve a reply memorandum." (emphasis added)).

Defendants, "[i]n the interest of brevity and to avoid redundancy . . ., incorporate[d] their Statement of Material Fact [sic]" as additional facts in opposition to Plaintiff's summary judgment motion. This is impermissible. *See Happy Tax Franchising, LLC v. Hill*, No. 19-24539-CIV, 2021 WL 3811041, at *3 (S.D. Fla. June 7, 2021), report and recommendation adopted sub nom. *Happy Tax Franchising, LLC v. JL Hill Grp., LLC*, No. 19-24539-CIV, 2021 WL 3793050 (S.D. Fla. Aug. 26, 2021) (refusing to consider arguments incorporated by reference because such arguments attempt to avoid the page limits set by the courts).

The Local Rules require that the "Additional Facts" section not exceed five pages. *See* S.D. Fla. L.R. 56.1(b)(2)(D). The document that Defendants offer in opposition to

Plaintiff's summary judgment motion contains an additional ten pages of facts. Thus, not only does the incorporation fail to accomplish its stated purpose -- brevity and avoidance of redundancy (many of the incorporated facts are redundant) -- but, more importantly, it violates the Local Rules' page limitation. Therefore, the Undersigned will not consider these purported additional facts from Defendants in evaluating Plaintiff's summary judgment motion.

The facts outlined below are generated, in part, from the paragraphs in each party's statement of facts or response to the statement of facts which the respective opposing party expressly agreed are undisputed. For those purported facts which the opposing party classified as partly disputed, the Undersigned includes only the undisputed portions. The Undersigned will retain the paragraph numbering used by Plaintiff and Defendants in their motion. The abbreviation "N/A," means that the paragraph is substantively and substantially disputed and cannot be reworded in a way to accurately reflect an actual undisputed fact.

The Undersigned sometimes changed the wording of an undisputed fact for stylistic and/or grammatical purposes. In addition, to enhance readability, I removed the specific record citations. They can be found in the source document, if needed.

If either party argued that a fact was disputed but did not provide record evidence to support the contention, then I deemed the fact to be undisputed if otherwise supported by record evidence.

At times, a party challenged a fact as disputed, but analysis demonstrates that the undisputed fact is not actually disputed. Instead, the party was at times merely offering an *additional*, but not **contradictory**, point.

To provide a factually-simple analogy, assume that a plaintiff in a garden-variety car collision personal injury case submits an affidavit (in support of a summary judgment motion) that the traffic light at issue was red for the defendant driver. Assume that the defendant submits a response, arguing that the fact is "disputed," and files a supporting affidavit saying (only) that it was storming and the visibility was poor. The weather and visibility might be *additional* facts leading to another point or argument, but they do not prevent the fact about the traffic light being red from being treated as **undisputed.**

This analogy applies even if the party offered *several* additional facts to support the notion that the undisputed fact is actually disputed. Thus, if the hypothetical affidavit mentioned above also explained that it was storming, the visibility was poor, the radio was on loud, it was dusk, the driver was changing stations on the car radio, the windshield wipers were inoperable and the plaintiff was speeding, none of these additional facts would cause the undisputed fact that the light was red for the defendant driver to somehow be deemed a **disputed** fact.

To provide a more-comprehensive and more-balanced factual background, the Undersigned sometimes combined an undisputed fact from a response and added it into the initial numbered paragraph.

5

If a party took the position that a purported undisputed fact is disputed but cited only to inappropriate source material, then the Undersigned would treat the undisputed fact as undisputed. For example, if a party relied solely on the *unverified* allegations of a pleading as supposed grounds to support the argument that a factual dispute exists, then that reliance is not well founded and was ignored, as it is mere rhetoric, inadequate to generate a viable evidentiary reason to conclude that a factual dispute exists.

If a party, in responding to a purportedly undisputed fact, injected a new fact (as opposed to actually opposing the undisputed fact or filing their own additional undisputed facts, as the Local Rule requires), then I would *sometimes* include the additional fact to provide context and a more-comprehensive factual narrative.

I will first provide Plaintiff's Statement of Material Facts and then Defendants' Statement of Material Facts. Because factual disputes and inferences must be resolved in favor of the non-moving party, this method, at times, will result in the same factual contention being characterized differently based upon which party provided or disputed the fact.

<u>Plaintiff's Statement of Facts</u>

The numbered paragraphs correspond to the numbered paragraphs in Plaintiff's Statement of Material Facts. [ECF No. 136].

1.      Regions holds a judgment entered January 23, 2020 against NBV Loan for $3,736,606.10 ("NBV Judgment"), on which $3,895,509.11 is owing with interest as of

October 14, 2022.

2.      Regions: (1) holds an unsatisfied writ of execution; (2) served writs of garnishment on F&F, NBV Loan's counsel, and Marquis Bank ("MB"), both of which served negative responses; and (3) obtained final judgment garnishing any Class 6 distributions to NBV Loan from Lexi's estate. Lexi has made no Class 6 distributions, and the NBV Judgment remains unpaid.

3.      In December 2005, the Bank Group made the Senior Loan to enable development of The Lexi. At the same time, Allen and Jill made the Junior Loan, then for $6 million, secured by Lexi's stock and guaranteed in full by Scott and Amy. The Bank Group, Allen and Jill entered into an Intercreditor Agreement ("ICA"), requiring Regions to provide Lexi default notices to Allen and Jill.

4.      To fund the Junior Loan, GFB made the GFB-Lexi Loan, secured by the Junior Loan documents, including Scott and Amy's Unlimited Guaranty.

5.      On June 23, 2008, Regions and Lexi modified the Senior Loan extending the maturity to April 5, 2009 and requiring Lexi to fund a $2 million collateral account with Regions. Lexi obtained the $2 million through an increase in the Junior Loan, funded by an increase in the GFB-Lexi Loan. Scott and Amy ratified their Unlimited Guaranty of the $8 million Junior Loan. The ICA was also modified to require Regions to send Lexi default notices to GFB, which then had the same right as Allen and Jill to cure Lexi's default or purchase the Senior Loan at par.

6.      On May 6, 2009, Scott met with GFB's President, Mehdi Ghomeshi ("Ghomeshi"), to review the ICA. The following day, Scott emailed Ghomeshi the October 2008 default notice not copied to GFB noting "it is critically important to both of our rights to determine that you were not properly notified per the [ICA] and subsequently not given an opportunity to take the appropriate actions under the loan documents. As discussed, Regions did not act in either of our interests."

7.      About a year later, GFB sued the Bank Group for breach of the ICA, alleging that GFB would have purchased the Senior Loan for par or cured Lexi's default if Regions had sent the default notices to GFB. After hearing the evidence, Judge Cristol characterized GFB's claim prosecuted by NBV Loan as "contrived" by Allen and Scott, the "opportunistic obligor and guarantor" of the GFB-Lexi Loan. [Defendants dispute this fact and argue that the claim was not contrived. However, Plaintiff accurately recites Judge Cristol's statements. Regardless, this fact is not material for purposes of summary judgment.].

8.      On November 5, 2009, the Greenwalds restructured their GFB debts. The GFB-Lexi Loan was split into Notes A and B, each for $4 million, and Scott and Amy again ratified their collaterally assigned Unlimited Guaranty of the Junior Loan and signed a Limited Guaranty of Note A up to $3,275,000. The limitation did not affect GFB's rights to Scott's and Amy's collateral. Additionally, Allen's personal recourse under Notes A and B was limited to $1 million, plus any collateral or the proceeds thereof pledged by

him.

9.     The Second Amended and Restated Loan Agreement with GFB acknowledged that Scott would fund $100,000 toward Lexi's claim against the Bank Group for breaching the ICA, and Allen, Jill, Scott and Amy respectively pledged proceeds in two limited partnerships, El Mercado Associates, Ltd. ("El Mercado") and Suniland Associates, Ltd. ("Suniland"), for the Notes and Limited Guaranty. [Defendants claim this is an inaccurate description of the pledge and that the documents speak for themselves. The documents confirm Plaintiff's statement, so this fact is treated as undisputed.].

10.     Effective February 1, 2011, Allen and Jill signed the Third Amended and Restated Notes A and B of $4 million each. Under Note B, Scott received a financial interest in the proceeds, if any, of GFB's lawsuit against the Bank Group, which had been filed in May 2010. GFB was entitled to 100% of the litigation proceeds to be applied first to payment of all legal fees and costs in pursuing the Bank Group, then to payment of Note A in full including interest, and then the net claim proceeds would be split 50% to Note B and 50% to Scott. On June 20, 2011, Scott and Amy ratified their Limited Guaranty of Note A.

11.     Effective June 30, 2012, Allen signed the Fourth Amended and Restated Notes A and B, and Scott and Amy ratified their Limited Guaranty of Note A. Scott's financial participation in the litigation proceeds remained the same. Scott and Amy also

ratified their assignments of the El Mercado and Suniland limited partnership proceeds.

12.     On January 28, 2014, the Greenwalds again restructured their GFB debts: in material part, Allen, Jill, Scott and Amy ratified and reaffirmed all obligations, loan documents and collateral for Notes A and B, including "all collateral guaranties," which remained extant; Scott and Amy ratified their Limited Guaranty of Note A; and Billy's Creek delivered Billy's Creek Mortgage up to $400,000 to secure Scott's and Amy's Limited Guaranty. Scott also pledged his deposit account ("Scott's Cash Collateral Account") for Notes A and B, and Allen and Jill ratified their Suniland partnership pledges.

13.     Allen and Jill failed to pay Notes A and B on the June 30, 2014 maturity date.

14.     In September 2015, Florida Community Bank ("FCB") was demanding payment of Notes A & B. On October 23, 2015, FCB demanded that Suniland pay Scott's pledged proceeds. [Defendants dispute this fact, which is supported by Plaintiff's citations, but provide no citation to record evidence; so, it is being treated as undisputed.].

15.     On September 17, 2015, Allen's lawyer, Eric Salpeter ("Salpeter") formed NBV Loan anonymously in Delaware. [Defendants dispute the remainder of this fact.].

16.     NBV Loan had no operating agreement until the day before the December 17, 2015 closing with FCB. NBV Loan falsely identified Salpeter as the sole manager, given that Allen owned and controlled NBV Loan from inception. [Defendants dispute the first sentence of this fact and because neither side supported their fact with evidence,

I have not included the sentence. Defendants also dispute the third sentence but cite no record evidence and it is otherwise supported by record evidence (i.e., Allen's testimony during the underlying proceedings that he is the "owner [and] manager" of NBV Loan and has been "since formation.").].

17.     Salpeter was only involved "[v]ery tangentially," had "little to nothing" to do with FCB negotiations, and "was pretty much told what the terms would be." [Defendants dispute the portion of this fact which represents that Allen and Salpeter concealed Allen's involvement from FCB based on Schantz's testimony that FCB was aware of Allen's involvement. Therefore, I have only included the portion of the fact for which there is no valid dispute.].

18.     Before the closing, **FCB emailed Salpeter and said that the operating agreement "needs to be signed by [NBV Loan's] member(s),"** and provided a form Borrowing Resolution for that purpose. On December 16, 2015, the day before the closing, Scott or someone on his behalf used LegalZoom to form NBV Member, falsely indicating that Salpeter was "the owner." [Defendants dispute Plaintiff's initial statement so I have rewritten it to accurately reflect the record evidence supporting the fact. Although Defendants dispute the remaining portion of this fact, they do not cite to any relevant evidence so I have treated the fact as undisputed.].

19.     On December 17, 2015, the transaction closed. Salpeter delivered Borrowing Resolutions for both NBV Loan and NBV Member, falsely identifying himself as

"Trustee" and manager of both entities, naming NBV Member as NBV Loan's sole member and Salpeter as NBV Member's sole member. Despite identifying himself as "Trustee," Salpeter admitted there was no Trust. [Defendants dispute this but provide no record citation, so I have treated the fact as undisputed.].

20.     The parties entered into the 2015 Assignment, signed by Salpeter as NBV Loan's Manager. A public record search would not have revealed Allen's ownership and control of NBV Loan.

21.     In exchange for $3.75 million in cash and NBV Loan's $250,000 promissory note, FCB assigned to NBV Loan the pending claims against the Bank Group and Lexi and the GFB-Lexi loan documents, including the collaterally assigned Junior Loan documents, Scott and Amy's Unlimited and Limited Guarantees and all collateral ("GFB-Lexi Loan Documents").

22.     On December 29, 2015, FCB moved to substitute NBV Loan in the Lexi Bankruptcy and Lexi Adversary Proceeding, **which did not disclose** Allen's involvement, as Salpeter signed a stipulation as NBV Loan's Trustee and sole manager. [Defendants dispute this fact, so I edited it slightly to remove some argumentative language.].

23.     On January 6, 2016, Salpeter and Allen signed Articles of Amendment to NBV Member's corporate filing, replacing Salpeter with Allen as member of NBV Member. **The amendment was sent to the Florida Secretary of State at some point**

**before the hearing but was not filed until January 19, 2016, after Judge Cristol had orally granted FCB's motion for substitution of NBV Loan at a hearing on January 14, 2016. It was not mentioned during the hearing that Allen was involved.** [Defendants dispute this fact and say that the document was sent in the mail on January 6, 2016. However, Allen's affidavit, which Defendants cite as support, states only that it was mailed "prior to any hearing." Therefore, I have edited the fact to accurately reflect the portion of the fact which Defendants' evidence actually contradicts.].

24.   N/A.

25.   On August 20, 2016, NBV Loan filed an Amended Complaint against the Bank Group for breaching the ICA, verified by Allen. On November 18, 2016, Regions served the PFS, which NBV Loan rejected following consultation with counsel. [Defendants dispute the suggestion that there was an affirmative rejection but provide no citation, so I am treating the fact as undisputed.].

26.   N/A. [Plaintiff did not cite to any evidence in support of this fact.].

27.   NBV Loan has never issued membership certificates, does not file tax returns, and reports no income or expenses of its own. Instead, all income and expenses are claimed by NBV Member and reported on Allen's personal tax returns. Member has not issued any membership certificates and does not file tax returns. [Defendants, despite stating that this fact is "undisputed," include additional argument/information. The Undersigned is not including the additions, as Defendants have not disputed the fact.].

28.     NBV Loan's primary business was to litigate the claim against the Bank Group. **NBV Loan also provided Lexi with DIP financing, and sued Lexi for breach of the GFB-Lexi Loan and obtained a $14,629,325 judgment.** NBV Loan was designed, however, to be judgment proof from inception. NBV Loan never had a bank account, cash, or any tangible asset in its own name. According to Scott, NBV Loan did not open its own bank account and instead used the NBV Member's Account because it "was probably easier to set up." [Defendants say undisputed but then provide an additional fact, which has been included.].

29.     A summary of deposits to and withdrawals from NBV Member's Account based on its general ledger and bank account statements reflects that NBV Member held only nominal cash, and as soon as funds were remitted by a Greenwald family interest, NBV Member would pay NBV Loan's debts leaving very little cash. [Defendants' dispute only a portion of this fact, which the Undersigned has removed.].

30.     The Greenwalds treated NBV Loan and NBV Member as one and the same. When NBV Loan settled with other members of the Bank Group, Allen reported the income on his personal tax return, identifying the recipient of the settlement funds as NBV Member, even though it was not a party to the litigation, and not mentioning NBV Loan at all. [Defendants dispute this fact and cite the same record, which in relevant part states:

Q. Okay. And NBV [Loan] never had any cash in its possession. Whatever cash was used to pay its bills were in the possession of NBV Member,

correct?
A. NBV Loan Member's bank account was part of NBV Loan Acquisition, LLC. So, to me, it was the same.
Q. So you make no -- so you make no distinction, really, between NBV [Loan] and NBV Member. Is that accurate?
A. They're -- As I said before, NBV Loan Acquisition Member, LLC is the manager of NBV Loan Acquisition, LLC. So that's their relationship. (edited for clarity).

Because the citation supports Plaintiff's fact, I treat it as undisputed.].

31.     According to Defendants, all funds remitted to NBV Member's Account belonged to NBV Loan. [Defendants dispute this but provide no record citation, so I am treating it as undisputed.].

32.     Allen used NBV Loan's funds to pay **invoices addressed to him**. For example, on August 8, 2018, Allen caused NBV Member to pay $14,308.70 of NBV Loan's funds to ASB for **invoices addressed to Allen Greenwald**. [Defendants dispute this fact, so I have slightly edited the paragraph to remove any inferences.].

33.     On October 15, 2018, NBV Member paid $20,000 of NBV Loan's funds to attorney Lawrence Schantz ("Schantz") for non-legal consulting services for Allen and Scott. [Defendants dispute a fact which was not written into Plaintiff's actual statement of fact. Further, their dispute does not contradict Plaintiff's fact and merely includes additional information. Therefore, the Undersigned treats this fact as undisputed.].

34.     Despite acquiring the Greenwald family debt and collateral, which was fully collectible at any time, Allen decided that NBV Loan would seek recovery from Regions or "not at all." [Defendants dispute the first sentence in Plaintiff's fact that "Allen

and Scott abused NBV [Loan] from inception." Because neither side provides a relevant record citation, I am not considering the fact.].

35.    NBV Loan eschewed collection of nearly $5 million in pledged Suniland distributions to Allen, Jill, Scott and Amy in 2016, including $1,652,837.99 paid to Allen. NBV Loan also ignored Scott's receipt of over $7.2 million from his Suniland general partnership interest. Although not pledged, those funds were available to collect on Scott's guaranties. [Defendants dispute this on the grounds that it is immaterial and they claim the vast cashflow was distributed before NBV Loan acquired the GFB-Lexi Loan. This is mere argument and not a proper dispute, so the Undersigned treats the fact as undisputed.].

36.    N/A.

37.    In June 2018, NBV Loan settled with the other members of the Bank Group for $825,000. On July 23, 2018, F&F received the funds, deducted $300,409.69 for at least three months of past due invoices, and then wired the $524,590.65 balance to NBV Member's Account.

38.    On July 24 and 26, 2018, NBV Member paid $350,000 of NBV Loan's settlement proceeds to GFS, for which NBV Loan received no value. Although GFS claims this payment was NBV Loan's "return of capital" to Allen, GFS is owned by Scott and Amy; Allen has no financial interest. Accordingly, $350,000 of NBV Loan's settlement proceeds were diverted to GFS for the ultimate benefit of Scott and Amy. [Defendants

dispute this fact but provide no citation to any evidence. Therefore, the Undersigned treats the fact as undisputed.].

39.     **The Bankruptcy Court granted NBV Loan permission to extend a DIP loan** to Lexi of up to $3.6 million ("NBV DIP Loan"). NBV Loan did not have any funds; instead, on May 25, 2017, the Dynasty Trust remitted $2.3 million to NBV Member's Account, and on May 30, 2017, NBV Member transferred $2,296,140 to Lexi. On June 19, 2017, the Family Trust remitted $200,000 to NBV Member's Account, and on the same day, NBV Member advanced the funds to Lexi. [Defendants dispute Plaintiff's phrasing so the Undersigned slightly reworded the fact to remove the dispute.].

40.     The Trusts claim that these payments were undocumented, no-interest demand loans to NBV Loan. The Trusts, however, did not authorize such loans. [Defendants dispute the second sentence by referring to Scott's testimony; when asked if a provision of the trust permitted such a loan, he stated "**I don't know. I would have to get a legal opinion.** But I believe that this was allowable under the trust and that's how I made that loan and that loan was repaid." (emphasis supplied). This does not refute Plaintiff's record citation so the Undersigned treats this fact as undisputed.].

41.     On October 24, 2017, Lexi caused $2,545,514.92 (proceeds of Marquis Bank's take-out DIP loan) to be wired to NBV Member's Account. Although NBV Loan was the lender of record, NBV Loan received none of the proceeds. Instead, the funds were paid into NBV Member's Account, and, on the same day, disbursed as follows: $2 million to

Dynasty Trust; $330,641 to Family Trust; $200,000 to Scott, and $16,000 to Scott and Amy. Allen did not require NBV Member to retain any funds to meet NBV Loan's continuing debts to its counsel or experts, and NBV Member's Account closed that month with a balance of $0.01.

42.     Scott and Amy never made any loans to NBV Loan and provided no value for the transfers of $16,000 and $200,000. Scott and his wife received these funds because Scott did not distinguish between the entity advancing the funds (Family Trust and Dynasty Trust) and the recipient of return funds from NBV Member's Account. [Defendants dispute whether Scott and Amy provided no value for the transfer of funds but cite to no evidence to support this contention. Because the fact is otherwise supported by record evidence, the Undersigned treats it as undisputed.].

43.     One of the assets NBV Loan acquired from FCB was Scott's Cash Collateral Account. At closing of the transaction, FCB wired the $65,949.27 balance to Salpeter's trust account, of which Salpeter applied $6,500 to pending fees and costs owed by NBV Loan, and released the balance, $59,449.27, to Scott. Scott provided no value to NBV Loan and his pledged funds were released to him because, according to Scott, "that was Scott Greenwald's money." [Defendants' dispute the claim that Scott provided no value to NBV Loan but do not provide a record citation. Because Plaintiff's citation otherwise supports the fact, the Undersigned treats the fact as undisputed.].

44.     Paragraph 40 of Billy's Creek Mortgage provides that if there is no

outstanding Event of Default, on payment of an additional $400,000 in Scott's Cash Collateral Account, such that the total cash is $500,000, then the holder will release Billy's Creek Mortgage. However, neither Scott nor anyone else satisfied this condition. [Defendants dispute that neither Scott nor anyone else satisfied this condition, claiming that that account was closed. This does not support a finding that the account never reached the $500,000 in funding required to satisfy the condition, so the Undersigned treats the fact as undisputed.].

45.    On September 4, 2018, and for no value, Allen signed NBV Loan's Satisfaction of Billy's Creek Mortgage, recorded on September 7, 2018, in order to obtain a $1.25 million replacement mortgage from a third-party lender. That mortgage was subsequently satisfied in favor of another third-party mortgage, this time for $2.75 million, in favor of third-party lender CCHC Fund II, LP. As of May 18, 2021, the CCHC mortgage balance was $3 million. [Defendants' dispute the claim that Billy's Creek Mortgage was satisfied for no value but do not provide a record citation. Because Plaintiff's citation otherwise supports the fact, the Undersigned treats the fact as undisputed.].

46.    N/A.

47.    Before trial, NBV Loan claimed damages that included losses sustained by Lexi ("Lexi Losses"). On January 10, 2019, shortly before trial, in response to Judge Cristol's inquiry as to how NBV Loan could claim Lexi Losses against Regions, NBV Loan

withdrew those claimed damages and announced that the sole damages against Regions were amounts owing on the GFB-Lexi Loan. [Defendants object to this fact by referring generally to a footnote concerning hearsay and judicial notice. Defendants cite no law for their position, or even the specific objection upon which this dispute is premised. Because Plaintiff's citation supports the factual contention, the Undersigned treats this fact as undisputed.].

48.     At the opening of trial, Mr. Friedman reiterated that the sole damages against Regions was the unpaid balance of the GFB-Lexi Loan, $14,629,325 in principal and interest, plus NBV Loan's attorneys' fees and costs. During the 11-day trial, NBV Loan attempted to prove that Regions' failure to send copies of Lexi default notices to GFB proximately caused GFB, FCB and NBV Loan not to be able to collect the GFB-Lexi Loan. On day seven, Judge Cristol expressed skepticism of NBV Loan's causation and damages theory. The writing was on the wall. [Defendants object to this fact by referring generally to a footnote concerning hearsay and judicial notice. Defendants cite no law for their position, or even the specific objection upon which this dispute is premised. Because Plaintiff's citation supports the factual contention, the Undersigned treats this fact as undisputed.].

49.     On April 8, 2019, NBV Loan submitted its closing argument, withdrawing its trial damages theory of the GFB-Lexi Loan balance and instead sought two components of Lexi Losses, the same components which were withdrawn before trial.

Mr. Friedman shared the draft of the closing argument with NBV Loan before submitting it. [Defendants object to this fact by referring generally to a footnote concerning hearsay and judicial notice. Defendants cite no law for their position, or even the specific objection upon which this dispute is premised. Because Plaintiff's citation supports the factual contention, the Undersigned treats this fact as undisputed. Defendants also claim that a hearing transcript contradicts the cited evidence, but this turned out to be an additional fact, not a dispute.].

50.     On April 2, 2019, six days before NBV Loan's closing-argument submission, Allen caused NBV Loan to release, for no value, the Greenwald Family's debts and collateral on the GFB-Lexi Loan. Allen and Jill's estate were each released from their $1 million obligations and collateral on Notes A and B. Scott and Amy were each released from their Unlimited Guaranty of the Junior Loan and their Limited Guaranty of Notes A and B and all associated collateral. Billy's Creek was released from its $400,000 mortgage obligation (which had already been fraudulently satisfied in November 2018). NBV Loan admitted that "part of the release" was to prevent the guaranties from falling into the hands of a third-party which could have enforced them against Scott and Amy. [Defendants dispute this fact but either fail to include citations to record evidence or cite to record evidence which does not support their dispute. Because Plaintiff's citations otherwise support the fact, the Undersigned treats the fact as undisputed.].

51.     The NBV-Greenwald Release excludes the judgment to be entered against

Lexi of $14,628,325. [Defendants dispute the remainder of this fact.].

52.     The first time Regions learned of the NBV-Greenwald Release was in June 2020, when NBV Loan produced the document in response to Regions' post-judgment discovery in aid of execution. [The Undersigned included only the portion of the fact for which Plaintiff provides evidentiary support. Although Defendants dispute the entirety of the fact, their dispute does not contradict Plaintiff's fact, so the Undersigned treats the fact as undisputed.].

53.     On June 7, 2019, Judge Cristol ruled, finding "not a scintilla of evidence prov[ing] that any damages to [NBV] were caused by [GFB's] not receiving the default notice required by the ICA." The GFB-Lexi Loan was always collectible from the Greenwald Family, but Allen caused NBV Loan not to collect it. Allen and Scott, the "opportunistic obligor and guarantor," had "contrived" the claim against Regions.

54.     On June 7, 2019, Judge Cristol entered Final Judgment for Regions on NBV Loan's claim, affirmed on appeal to the district court.

55.     Although Scott claims that he made two payments of $100,000 each in April 2019 as consideration for NBV Loan's release of his guaranties/collateral, those payments were made by the Family Trust to NBV Member's Account, and Scott is not a beneficiary of that Trust. Thus, Scott provided no cash consideration for release of his guaranties and collateral. Allen did not know if the $200,000 was paid for the NBV-Greenwald Release. [Defendants dispute the claim that Scott provided no cash consideration but do not

provide a record citation. Because Plaintiff's citation otherwise supports the fact, the Undersigned treats the fact as undisputed.].

56.     Scott also claims he provided reasonably equivalent value because he relinquished his financial interest in the claim against Regions. [The Undersigned removed the disputed portion of this fact.].

57.     N/A.

58.     As of April 1, 2019, NBV Loan owed F&F $403,615.89, but had just $1,932.49 available in NBV Member's Account. NBV Loan still owes past due legal fees and costs to F&F of $244,521.11. NBV Loan does not contend that F&F did not perform the work or committed any malpractice. Because Allen decided not to fund NBV Loan, F&F was left unpaid. [Defendants' dispute is not an actual dispute. It is an additional fact. Thus, the Undersigned treats the fact as undisputed.].

59.     Scott was involved in the decision to form NBV Loan and the different legal strategies related to formation. NBV Loan's counsel, Friedman, communicated with Scott as delegated by Allen and, during trial preparation and trial, attended the entire trial. Lexi's counsel continued to participate after Lexi stipulated to judgment during openings. [Because neither side supported certain so-called facts with record evidence, the Undersigned removed the portion of this fact which Defendants dispute.].

<u>Defendants' Statement of Facts</u>

1.     NBV Loan is a Delaware Limited Liability Company that was registered in

23

Delaware on September 15, 2015 and is currently in good standing. [The Undersigned slightly edited this fact to accurately reflect the disputed portion because neither side cited to evidence indicating (one way or the other) whether NBV Loan's standing has ever lapsed.].

2.      NBV Member is a Florida limited liability company registered in the State of Florida since December 17, 2015 **whose registration lapsed in 2021 but was reinstated on October 5, 2021** and is currently in good standing. [The Undersigned slightly edited this fact to reflect the dispute.].

3.      Allen is the sole member of NBV Member, which is the sole member of NBV Loan.

4.      Allen and his late wife, Jill Greenwald, were indebted to Florida Community Bank ("FCB") in the amount of $8 million under two (2) promissory notes, Note A in the amount of $4 million and Note B in the amount of $4 million. [The Undersigned removed the disputed portion of this fact.].

5.      Note A and Note B were secured by a limited guarantee given by Scott and Amy ("Limited Guaranty"), a collateral assignment of an unconditional guarantee given by Scott and Amy ("Unlimited Guaranty"), and a mortgage on certain real property owned by Billy's Creek ("Billy's Creek Mortgage"). [Plaintiff states that this fact is undisputed but adds in an additional fact, which the Undersigned does not include here because it does not create a dispute.].

6.      The stated maturity dates of Note A and Note B are June 30, 2014, **and they were extended by NBV Loan.** [Plaintiff disputes this fact, so the Undersigned edited it slightly to reflect the dispute.].

7.      In 2014, Note A and Note B were in default, and Allen, represented by Schantz, entered into negotiations with FCB to undertake a loan workout.

8.      Schantz testified that at no time did Allen try to conceal himself as part of the transaction that would ultimately result in NBV Loan's purchase of the GFB-Lexi Loan, and that at all times, FCB knew of Allen's involvement with acquiring the GFB-Lexi Loan, and that he would remain involved, through an investor or directly in owning the loan. [Defendants include approximately two-and-a-half pages of testimony as part of this fact, which the Undersigned will not quote verbatim. Plaintiff disputes the fact, but its dispute is not over whether Defendants accurately quoted the transcript. Rather, Plaintiff's dispute is that this evidence cannot be trusted because Schantz expressed his testimony might be conjecture. This is more appropriately considered an additional fact.].

9.      Judge Cristol determined, based on the allegations asserted in Lexi's Bankruptcy Case, that there was nothing illegal or improper about Allen choosing to keep his identity concealed and that Allen had a legal right to do so. [Plaintiff disputes this fact. The Undersigned has removed the portions of the fact which are legal argument rather than fact and included only what Judge Cristol stated. The Undersigned has also elected to not include the lengthy hearing transcript quotation.].

10.     N/A. [This is not a material fact; it is a legal argument.].

11.     In 2017, NBV Loan provided court-approved DIP financing to Lexi of up to $3.6 million, which paid the settlement reached with the Debtor's first mortgagee, Lexi North Bay LLC, to pay off Lexi's first mortgage, and outstanding condominium maintenance fees. [Plaintiff disputes the remainder of Defendants' fact, which is that the loan was essential to Lexi's reorganization efforts. Because the fact is unsupported by Defendants' record citation, the Undersigned treats this portion of the fact as disputed.].

12.     Pursuant to Lexi's confirmed Fourth Amended Chapter 11 Plan, NBV Loan has an allowed Class 6 Claim in Lexi's Bankruptcy Case in the amount of $14,629,325.00, comprising nearly 90% of the entire Class 6 claims.

13.     N/A.

14.     Regions garnished NBV Loan's distribution in Lexi's Bankruptcy Case and will recover all the funds to be distributed to NBV Loan on account of its Class 6 claim.

15.     On November 18, 2016, during the pendency of the State Court Action and before removal to the bankruptcy court, Regions served NBV Loan an amended proposal for settlement in the amount of $5,000 ("PFS"), to which NBV Loan did not respond.

16.     On July 19, 2018, Judge Cristol entered partial summary judgment on liability against Region in the Adversary Proceeding.

17.     NBV Loan received a court-approved settlement with the other bank defendants (the "Bank Group") in the Adversary Proceeding in the amount of $825,000.

18.     Judge Cristol's Findings of Fact and Conclusions of Law was entered on June 7, 2019 in the Adversary Proceeding.

19.     Regions' Supplemental Judgment for Attorney's Fees against NBV Loan was entered January 23, 2020.

20.     N/A. [Although Plaintiff says that part of this fact is undisputed, the sentences that it highlights as undisputed are not part of Defendants' fact. Thus, the Undersigned treats the entire fact as disputed.].

21.     N/A.

22.     Mr. Mukamal's opinion states: "NBV [Loan] was never capitalized or in control of its ability to pay debts." [The remainder of this fact is disputed.].

23.     Mr. Mukamal further testified that:

Q. So from that point until the entry of the supplemental final judgment entered in favor of Regions for attorneys' fees against NBV Loan Acquisition, it is your opinion that NBV Loan Acquisition never owned anything and had no assets other than the FCB note, A and B, and ---
A. Well, you're calling it my opinion, but consider it more of a fact than an opinion.
Q. So it appears that from reading your report that you didn't consider any of the moneys that were deposited into the account in the name of NBV Member were assets that belonged to NBV Loan Acquisition?
A. NBV Loan Acquisition never had a bank account, so it didn't have the ability to hold moneys other than perhaps cash, which there's no evidence of.
Q. And you're aware that NBV Loan Member was the sole member of NBV Loan Acquisition?
A. I'm aware.
Q. And that doesn't change your conclusions with respect to the moneys that were deposited into an account in the name of NBV Member?
A. No.

Q. So as far as you're concerned, those are moneys that belong to NBV Member, those are not NBV Loan Acquisition's moneys in those accounts?
A. They're not.
Q. And based on your analysis, that was true from the time that the loans were purchased by NBV [Loan] from FCB until the time that the final judgments were entered for the attorneys' fees in favor of Regions against NBV Loan Acquisition?
A. At all times relevant.
Q. So that means that NBV Loan was never in control of any of the funds that were deposited and withdrawn in and out of NBV Member's [A]ccount. Is that right?
A. Not directly.
Q. Okay. So it had indirect control?
A. They never had control over Member's bank account.

[Plaintiff disputes this fact; but its dispute concerns the inferences that should be afforded and the ultimate meaning of this testimony. Plaintiff does not claim that Defendants quoted the transcript incorrectly. Thus, the Undersigned treats the fact as undisputed.].

24.     Mr. Mukamal's Expert Report admits that the Greenwald Defendants provided NBV Loan with $1.3 million more than they received back from NBV Loan.

25.     N/A.

26.     Carol Fox, Defendants' rebuttal expert, opined that this was neither a novel or improper practice for NBV Loan to engage in, as even large conglomerate corporations with related entities maintain sweep accounts into which a parent or affiliate, as a treasury, deposits funds into its subsidiary or affiliate's account as needed to meet its obligations.

27.     Ms. Fox also noted that there were no abuses of the corporate form, as none of the expenditures out of NBV Member's Account were made for Allen's personal benefit

– they were either returns of funds to repay funds that were provided by Greenwald loans or payment of NBV Loan's debts and expenses. [Plaintiff's dispute does not change the reality that this is what Ms. Fox opined. Thus, the Undersigned treats the fact as undisputed.].

28.    N/A. [Questions are not record evidence which would support a fact.].

29.    N/A. [Ms. Fox's testimony concerns a legal conclusion, which is impermissible expert testimony.].

Plaintiff's Additional Facts[2]

30.    NBV Loan and the Greenwalds concealed Allen's involvement with NBV Loan from FCB and the Bankruptcy Court. On January 6, 2016, Salpeter and Allen signed Articles of Amendment to NBV Member's corporate filing, replacing Salpeter with Allen as member of NBV Member. However, Salpeter withheld filing the amendment until January 19, 2016, after Judge Cristol had orally granted the motion for substitution on January 14, 2016. On learning of these facts, Judge Cristol observed "a bad smell here."

31.    One of the assets NBV Loan acquired from FCB was Scott's Cash Collateral Account. At closing of the transaction, FCB wired the $65,949.27 balance to Salpeter's trust

---

[2]    The Local Rules permit the opponent of a summary judgment motion to assert any additional facts that the opponent contends serve to defeat the motion for summary judgment. *See* S.D. Fla. L. R. 56.1(a)(2). If the opponent elects to assert additional facts, then the movant must respond to any additional facts. *See* S.D. Fla. L. R. 56.1(a)(2). Defendants have failed to respond to Plaintiff's additional facts, as required. Therefore, if Plaintiff's additional fact is supported by record evidence, then the Undersigned will treat the fact as admitted by Defendants. *See* S.D. Fla. L. R. 56.1(c).

account, of which Salpeter applied $6,500 to pending fees and costs owed by NBV Loan, and released the balance, $59,449.27, to Scott. Scott provided no value to NBV Loan and his pledged funds were released to him because according to Scott, "that was Scott Greenwald's money."

32.     NBV Loan was granted leave to make the DIP Loan up to $3.6 million. NBV Loan did not have any funds; instead, on May 25, 2017, the Dynasty Trust remitted $2.3 million to NBV Member's Account, and on May 30, 2017, NBV Member transferred $2,296,140 to Lexi. On June 19, 2017, the Family Trust remitted $200,000 to NBV Member's Account, and on the same day, NBV Member advanced the funds to Lexi.

33.     The Trusts claim that these payments were undocumented, no-interest demand loans to NBV Loan. Such loans were not authorized under the provisions of the Trusts. There are no loan documents or contemporaneous entries in NBV Member's records of Trust loans to NBV Loan.

34.     On October 24, 2017, Lexi caused $2,545,514.92, repayment proceeds of the DIP Loan, to be wired to NBV Member's Account. Despite being lender of record, NBV Loan received none of the proceeds directly. Instead, Allen caused the funds to be paid into NBV Member's Account, and, on the same day, disbursed as follows: $2 million to Dynasty Trust; $330,641 to Family Trust; $200,000 to Scott, and $16,000 to Scott and Amy. Allen did not require NBV Member to retain any funds to meet NBV Loan's continuing debts to its counsel or experts, and NBV Member's Account closed that month with an

overdrawn balance of -$0.01.

35.     Scott and Amy never made any loans to NBV Loan and provided no value for the transfers of $16,000 and $200,000. Scott and his wife received these funds because Scott did not distinguish between the entity advancing the funds (Family Trust and Dynasty Trust) and the recipient of return funds from NBV Member's Account.

36.     NBV Loan was represented by F&F in the Underlying Litigation on an hourly fee basis and incurred fees/costs on a continuing monthly basis. As of October 24, 2017, NBV Loan owed F&F more than $18,000, including some fees/costs outstanding more than 60 days. By November 7, amounts owing to F&F had increased to $44,336.81, some more than 90 days past due. Instead of retaining the DIP Loan proceeds to fund NBV Loan's ongoing expenses, Allen caused NBV Member to disburse all proceeds, leaving an overdraft.

37.     In June 2018, NBV Loan settled with the other members of the Bank Group for $825,000. On July 23, 2018, F&F received the funds, deducted $300,409.69 for past due legal fees/costs, and wired the $524,590.65 balance to NBV Member's Account, which at the time of the incoming transfer had a balance of just $2,533.96.

38.     On July 24 and 26, 2018, NBV Member paid $350,000 of NBV Loan's settlement proceeds to GFS, for which NBV Loan received no value. Although GFS claims this payment was NBV Loan's "return of capital" to Allen, GFS is owned by Scott and Amy; Allen has no financial interest. Accordingly, $350,000 of NBV Loan's settlement

proceeds were diverted to GFS for the ultimate benefit of Scott and Amy.

39.     On August 8, 2018, NBV Member paid $14,308.70 of the settlement proceeds to ASB for Allen's personal legal fees.

40.     On August 21, 2018, NBV Member paid an additional $60,000 of the settlement proceeds to the Family Trust, for which NBV Loan received no value.

41.     On September 4, 2018, NBV Loan satisfied the Billy's Creek Mortgage for no value, releasing collateral of $400,000 in the process. As of the date of the satisfaction, NBV Member had $102,800.91 on deposit, which funds were being quickly depleted— NBV Member paid $78,518.63 to F&F for legal fees on September 21, 2018, reducing its cash to $24,282.28. NBV Member continued hemorrhaging cash in the following months, ending October with just $2,737.45 and November with an overdraft of -$10,300.71.

42.     On October 15, 2018, NBV Member paid the remaining settlement proceeds to Schantz for non-legal consulting services for Allen and Scott.

43.     By October 31, 2018, NBV Member's Account had an ending balance of $2,737.45. As of that date, NBV Loan owed F&F a total of $46,130.04, which increased to $127,903.07 by November 12, 2018, and $211,700.05 by December 7, 2018, at this point as much as 60 days past due.

44.     Regions did not learn of the fraudulent transfers from NBV Member's Account to Defendants, as identified in the Corrected Amended Complaint, until after entry of the NBV Judgment when NBV Loan and third parties produced documents in

response to Regions' discovery in aid of execution.

45.     As principal of NBV Loan, Allen made the decision not to collect on the GFB-Lexi Loan from himself, his family or the collateral that they had pledged as security.

46.     Allen controlled the funds in NBV Member's Account as the sole account signatory.

47.     NBV Loan admitted that "part of the [NBV-Greenwald Release]" was to prevent the guaranties from falling into the hands of a third party which could have enforced them against Scott and Amy. NBV Loan stamped Notes A and B and the related debt instruments "VOID".

## II.     Legal Standard

### A.     Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party must "show the district court, by reference to materials on file,

that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant does so, then "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The opposing party must proffer more than "a mere scintilla of evidence" to show "that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (internal quotations omitted).

When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). This means that the Court must draw all inferences in favor of the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Tana v. Dantanna's*, 611 F.3d 767, 772 (11th Cir. 2010). Summary judgment "may be inappropriate where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ., Bibb County*, 495 F.3d

1306, 1315 (11th Cir. 2007).

The standard for assessing competing summary judgment motions is no different than the standard for assessing a single summary judgment motion. *Am. Bankers. Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). Each competing motion must be considered on its own merits. *Id.* In other words, competing or cross-motions for summary judgment do not permit a court to grant summary judgment unless one of the moving parties is entitled to judgment as a matter of law on facts not genuinely in dispute. *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Because each motion must be considered on its own merits, inferences which may fall in Plaintiff's favor when assessing Defendants' summary judgment motion will fall in Defendants' favor when assessing Plaintiff's summary judgment motion.

## III.    Analysis

Before turning to the parties count-specific arguments, the Undersigned will address some principles of law which will frame how the Court will consider prior testimony from the Adversary Proceeding and Judge Cristol's findings of fact and conclusions of law. The Undersigned will also provide an organizational roadmap.

In Defendants' Response to Plaintiff's Statement of Undisputed Material Facts, they argue in a footnote that the Undersigned cannot consider testimony from the adversarial hearing before Judge Cristol because Plaintiff has not requested that the Undersigned take judicial notice of the transcript and such testimony is hearsay. This

argument is rejected.

As a preliminary matter, "addressing legal arguments in footnotes is an incorrect method to present substantive arguments on the merits or otherwise request relief from the Court." *Sony Music Ent. v. Vital Pharms., Inc.*, No. 21-22825-CIV, 2022 WL 4771858, at *13 (S.D. Fla. Sept. 14, 2022). Further, Defendants cite no law in support of their claim that Plaintiff was required to request that these documents be judicially noticed, which effectively waives the argument. *Flanigan's Enters., Inc. of Ga. v. Fulton Cnty., Ga.*, 242 F.3d 976, 987 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument). Finally, Defendants have failed to explain how in-court, sworn testimony from a prior proceeding is *per se* hearsay or why, even if it was, such statements (made by some of the defendants in the instant case) would not qualify as statements or admissions of a party opponent. *See* Fed. R. Evid. 801(d)(2); *see also Dillon v. Cobra Power Corp.*, 560 F.3d 591, 596 (6th Cir. 2009) ("The district court correctly noted that trial testimony may be submitted for consideration at the summary judgment stage, but such testimony comes from prior proceedings that are submitted as part of the pretrial record. In other words, sworn testimony given in earlier court proceedings is the same as the pleadings, the discovery [including depositions] and disclosure materials on file, and any affidavits which Rule 56(c) expressly allows the court to consider." (internal quotations omitted)).

Both parties include in their statements of facts and use as support for their

arguments excerpts of Judge Cristol's "findings of fact" or purported "conclusions of law." Plaintiff repeatedly references Judge Cristol's characterization of GFB's claim (which was prosecuted by NBV) as "contrived" by Allen and Scott, the "opportunistic obligor and guarantor" of the GFB-Lexi Loan, as well as Judge Cristol's comment that there was a "bad smell" surrounding NBV Loan's substitution for FCB in the litigation. Likewise, Defendants repeatedly highlight Judge Cristol's statement that

> [w]hat [Allen] Greenwald did [by allegedly concealing his involvement with NBV] was not illegal and it was not immoral. And although you try to raise the question that he was a naughty person, the Court disagrees. He had every right to do what he did, and if he wanted to do it in secrecy, the law allows it.

The Eleventh Circuit has explained that a district court "may not take judicial notice of a finding of fact by the bankruptcy court." *In re Delta Res., Inc.*, 54 F.3d 722, 726 (11th Cir. 1995). Instead, requesting a court to take judicial notice of another court's order is permissible "for the limited purpose of recognizing the 'judicial act' that the order represents." *Thomas v. Sec'y, Fla. Dept. of Corr.*, 644 F. App'x 887, 888 (11th Cir. 2016) (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).

Judge Cristol's statements that there was a "bad smell," that the litigation was "contrived," or that Allen Greenwald's actions were "not immoral" and that he did not think Allen was a "naughty person" are, for all practical purposes, factual findings based on the evidence presented to the bankruptcy court. Therefore, the Undersigned will not consider them for purposes of assessing the parties' competing summary judgment

motions.

The only statement which could *possibly* be seen as a judicial act is Judge Cristol's statement that what Allen did was "not illegal" and the "law allows it." However, even this is not conclusive because the actual order from Judge Cristol states only that "[f]or the reasons stated on the record at the hearing, it is **ORDERED AND ADJUDGED** that [Regions'] Motion is **DENIED**." [ECF No. 133-23]. Judge Cristol's oral ruling provides an equally conclusory statement: "[t]he Court finds that motion to be without merit, and therefore, the Court will direct Mr. Russin to draw an order overruling the objection, and not disallowing or designating NBV [Loan's] vote." [ECF No. 133-10].

Thus, when read in context, the actual legal basis for Judge Cristol's ruling remains unclear. However, the Undersigned need not decide whether this statement is properly considered because, as explained below, Defendants' issue preclusion argument is without merit (even if this statement is considered) and whether Allen's conduct is "illegal" (or not) does not impact whether either side is entitled to summary judgment (given the other factual disputes).

Because Plaintiff and Defendants are both seeking summary judgment on Counts I, XV, and XVII, the Undersigned will begin by addressing those three Counts individually. Then, the Undersigned will address Defendants' remaining summary judgment arguments on an argument-by-argument basis (as opposed to count-by-count) because that is how Defendants organized their motion.

## A.      Count I (Piercing the Corporate Veil)

In this count, Plaintiff seeks declaratory relief that NBV Loan is a mere instrumentality or alter ego of NBV Member and NBV Member is a mere instrumentality of Allen Greenwald. [ECF No. 95, ¶¶ 88-94]. Plaintiff and Defendants both seek a favorable summary judgment ruling on this count. According to Plaintiff, NBV Loan was created to be judgment proof and Allen Greenwald "used his complete control over NBV [Loan] to insulate himself and his family from their respective obligations." [ECF No. 135]. Further, Plaintiff avers that "NBV Member was never capitalized and had no assets of its own" because its purpose was only as "a payment conduit to keep NBV [Loan] cashless while depleting or diverting its fund through NBV Member's [A]ccount for entirely personal benefit for himself and his family." *Id.*

Defendants dispute this characterization and claim that the "record is devoid of any evidence that either NBV Loan or NBV Member were created or operated to perpetrate a fraud on any creditor, including Regions." [ECF No. 145]. In their own affirmative request for summary judgment, Defendants characterize the actions of Allen, NBV Loan, and NBV Member as lawful and for the purpose of engaging in "legitimate business operations." [ECF No. 132]. Further, Defendants argue that Judge Cristol rejected Plaintiff's alter ego and veil-piercing arguments during the Adversary Proceeding and issue preclusion requires this court to follow suit. *Id.*

To begin, the Undersigned rejects Defendants' issue preclusion argument. First,

the substance of the argument is raised in two footnotes. [ECF Nos. 132, p. 17, n.9; 145, p. 10, n.9]. As stated previously, "addressing legal arguments in footnotes is an incorrect method to present substantive arguments on the merits or otherwise request relief from the Court." *Sony Music Ent.*, 2022 WL 4771858, at *13.

Second, and more importantly, Judge Moreno has already rejected this argument -- phrased then as a bar based on res judicata -- when Defendants raised it during the motion to dismiss stage. As stated by Judge Moreno:

> Identity lacks in this case. The Court has reviewed the [bankruptcy] documents attached to the Greenwalds' motion to dismiss. While they are correct that Regions raised alter ego-type arguments (albeit embedded in bankruptcy issues different than those in this case), Regions is correct to point out that the bankruptcy judge considered only NBV Loan's formation and acquisition of the Greenwald debt and NBV Loan's substitution in the bankruptcy proceedings. Neither NBV Loan's structure and operations nor the alleged fraudulent transfers are discussed or even referenced in the Motion to Designate, the Objection to Confirmation, the evidentiary hearing and the following order, or the findings of fact and conclusions of law.

[ECF No. 48].

Indeed, Defendants are well aware of this ruling given that they cited it in support of their own argument that the Court cannot apply collateral estoppel in considering some of Judge Cristol's negative comments about the Greenwalds. [ECF No. 145, p. 3, n.4 (citing Judge Moreno's Order for the proposition that "[i]dentity lacks in this case")].

Issue preclusion refers to what was formerly known as collateral estoppel. *Colorado W. Transp., Inc. v. McMahon*, 380 B.R. 911, 916 (N.D. Ga. 2007). In Florida, issue preclusion

requires "that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction." *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006). As explained by Judge Moreno, the issues here are different; Plaintiff's evidence -- which expands well beyond what was presented to the bankruptcy court -- prevents any finding that the issues are identical.

Moreover, issue preclusion operates to prevent the re-litigation of only issues that were decided, or "actually adjudicated," between the parties in an earlier lawsuit. *See Gordon v. Gordon*, 59 So. 2d 40, 44 (Fla. 1952) (stating that issue preclusion prevents "parties from litigating in the second suit issues—that is to say points and questions—common to both causes of action and which were actually adjudicated in the prior litigation"). This requirement is enforced with rigor. Thus, preclusive effect is not given to issues which were not definitively decided -- even if it is *possible* that they were -- in the earlier lawsuit. *See, e.g., Acadia Partners, L.P. v. Tompkins*, 673 So. 2d 487, 488–89 (Fla. 5th DCA 1996) (holding that jury's verdict "for [the defendant]" in a breach of contract action did not establish the absence of breach because the jury was instructed that it could find for the defendant if it concluded that the defendant had not breached the contract or if the defendant proved an affirmative defense); *Allstate Ins. Co. v. A.D.H., Inc.*, 397 So. 2d 928, 929–30 (Fla. 3d DCA 1981) (concluding that subcontractor could not show that general contractor was at fault and therefore not entitled to indemnification based on

jury's "undifferentiated general verdict finding [the general contractor] 'negligent'" in an earlier lawsuit; the jury could have determined that the general contractor was at fault or vicariously liable).

As stated previously, it is unclear the *exact* reasons why Judge Cristol denied Regions' motion. It is possible that Judge Cristol denied Regions' motion because the evidence, although appropriate to consider, was insufficient, standing alone. It is also possible that Judge Cristol denied Regions' motion because the evidence should not even be considered. This ambiguity precludes the Undersigned from finding that this issue was "actually adjudicated."

At bottom, there are myriad procedural and merits-based reasons which warrant rejecting Defendants' issue-preclusion argument. Accordingly, it is appropriate to address the merits of Plaintiff's claim.

Assessing Plaintiff's alter ego/piercing-the-veil claim requires an examination of both Delaware and Florida law. [ECF No. 48 ("Florida law controls the claim seeking to hold NBV Member as an alter ego, and Delaware law controls the claim seeking to hold NBV Loan as an alter ego.")].

In Delaware, a plaintiff seeking to pierce the corporate veil under the alter ego theory "'must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present.'" *Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Grp. Glob. I LLC*, No. CV 18-

654-RGA, 2019 WL 148454, at *3 (D. Del. Jan. 9, 2019) (quoting *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008)). Delaware courts consider multiple factors in determining whether to disregard the corporate form, including: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder." *Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021). Moreover, "[a]cts intended to leave a debtor judgment proof are sufficient to show fraud and injustice." *Id.* at 708-09 (citing *Compagnie des Grands Hotels*, 2019 WL 148454, at *5).

Concerning Florida law, as the Eleventh Circuit has stated:

It is black letter law in Florida that to disregard this corporate fiction and hold the corporation's owners liable—to "pierce the corporate veil"—the plaintiff must prove that:
> (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation;
> (2) the corporate form must have been used fraudulently or for an improper purpose; and
> (3) the fraudulent or improper use of the corporate form caused injury to the claimant.

*Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 (11th Cir. 2011) (citing *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008)).

Although not identical, the laws of these two states share important similarities.

Crucial to this analysis, both states require that the corporation and the shareholder have only an illusory separate existence and that the corporate form be used for some type of fraud, injustice, or improper purpose.

When viewing the facts in the light most favorable to Defendants (i.e., when considering Plaintiff's request for summary judgment in its favor), the facts -- and inferences that flow from those facts -- establish the following:

(1) Allen owned and controlled NBV Loan from inception (¶ 16);

(2) NBV Member was the only member of NBV Loan (¶ 19);

(3) Allen eventually became NBV Member's sole member (¶¶ 19, 23);

(4) NBV Loan has never issued membership certificates, does not file tax returns, and reports no income or expenses of its own. Instead, all income and expenses are claimed by NBV Member and reported on Allen's personal tax returns. NBV Member has not issued any membership certificates and does not file tax returns either (¶ 27);

(5) NBV Loan never had a bank account, cash or any tangible asset in its own name. According to Scott, NBV Loan did not open its own bank account and instead used the NBV Member's Account because it "was probably easier to set up." (¶ 28);

(6) A summary of deposits to and withdrawals from NBV Member's Account based on its general ledger and bank account statements reflects that NBV Member held only nominal cash, and as soon as funds were remitted by a Greenwald family interest, NBV Member would pay NBV Loan's debts leaving very little cash (¶ 29);

(7) The Greenwalds treated NBV Loan and NBV Member as one and the same. When NBV Loan settled with other members of the Bank Group, Allen reported the income on his personal return, identifying the recipient of the settlement funds as NBV Member, even though it was not a party to the litigation, and not mentioning NBV Loan at all. (¶ 30);

(8) According to Defendants, all funds remitted to NBV Member's Account belonged to NBV Loan. (¶ 31);

(9) Allen used NBV Loan's funds to pay invoices addressed to him. For example, on August 8, 2018, Allen caused NBV Member to pay $14,308.70 of NBV Loan's funds to ASB for invoices addressed to Allen Greenwald (¶ 32);

(10) In multiple instances, NBV Member distributed funds to Greenwald entities or family members for no consideration (¶¶ 42, 43-45, 50); and

(11) NBV Loans still owes $200,000 in its own attorneys' fees, which it does not have the funds to pay (¶ 58).

Plaintiff's argument in support of summary judgment relies heavily on a few key facts and inferences which must, at the summary judgment stage, be resolved in Defendants' favor.

First, there is evidence from Schantz -- however shaky and incredible it might seem to Plaintiff -- which supports Defendants' contention that FCB was aware that the Greenwalds were involved with the purchase of the debts and litigation claims. Second, the Greenwalds' unwavering belief that they would receive a favorable judgment in NBV Loan's suit against Regions -- although improbable given Judge Cristol's comments and their attorney's actions -- is not fantastical. Third, although NBV Loan and NBV Member were seemingly funded at the whim of Allen, they were sufficiently funded to cover expenses as they came due (at least until the subject judgment was entered) and actually extended a court-approved loan to Lexi.

Certainly, many of Allen's actions appear questionable, suspicious and dubious. Indeed, even when viewing the evidence in the light most favorable to Defendants, Plaintiff has made a strong case for piercing the corporate veil under both Florida and Delaware law. However, it is still technically insufficient to warrant summary judgment. In effect, Plaintiff wants this Court to conclude that testimony from Allen, his family members and attorney is false and therefore is incapable of being considered. But this would require the Court to make credibility assessments.

This result -- an inability to grant summary judgment -- is consistent with how Delaware Courts have examined piercing the corporate veil at the summary judgment stage:

> In support of their alter ego theory, the plaintiffs assert: (1) the lack of corporate formalities in operating Green Farms, Inc., especially the maintenance of adequate corporate records; (2) the commingling of assets between the shareholders and the corporation; and (3) the undercapitalization of the corporation. [The] [p]laintiffs' brief highlights numerous instances where the defendants apparently failed to follow normal corporate formalities. And the defendants admitted in their brief that the corporate records maintained by Green Farms failed to "meet the normal standard for such corporate records."

> Such glaring oversights seemingly present a good case for piercing the corporate veil. At this stage of the proceedings, however, it would be premature to pierce the corporate veil of Green Farms, Inc. because several material facts are still in dispute. It is unclear whether there was an actual commingling of assets between the shareholders and the corporation. John L. Green, Sr. and Marian Green apparently made loans to Green Farms, Inc. and then obtained repayment by transferring assets from the corporation to themselves. Such a transfer of assets, however, is not necessarily a basis for piercing the corporate veil. The plaintiffs must also show that such transfers were done to defraud creditors or were done merely to siphon off corporate

46

assets, rather than to repay outstanding loans. This has not yet been done. Furthermore, questions exist as to the ownership of the stock of Green Farms, Inc. and the existence or whereabouts of corporate books and records.

As noted previously, persuading a Delaware court to disregard the corporate entity is a difficult task, even after trial on the issues. *See Alger Oil Co., supra.* Consequently, the piercing of the corporate veil on a motion for summary judgment is an even more onerous task and, while the present record seems to indicate that Green Farms, Inc. was the alter ego of John L. Green, Sr. or the other stockholders, I cannot find that the entry of a final judgment is proper at this time. [The] [p]laintiffs' motion for summary judgment is, therefore, denied.

*Harco Nat. Ins. Co. v. Green Farms. Inc.*, No. CIV. A. 1131, 1989 WL 110537, at *6 (Del. Ch. Sept. 19, 1989) (internal citations to the record omitted).

The question of fraud, injustice, or improper purpose is primarily a question of intent. *See, e.g., In re Hillsborough Holdings Corp.*, 176 B.R. 223, 244-45 (M.D. Fla. 1994) (citing Florida cases and holding that fraud and/or intentional wrongful conduct is required to pierce corporate veil because "negligent or reckless behavior does not constitute improper conduct"); *Laifail, Inc. v. Learning 2000, Inc.*, No. C.A.01-599 GMS, 2002 WL 31667861, at *11 (D. Del. Nov. 25, 2002) (To demonstrate that an overall element of injustice or unfairness is present, "[e]ffectively, 'the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.'" (quoting *In re Sunstates Corp. Shareholder's Litig.*, Del. Ch. 788 A.2d 530, 534 (Del. Ch. 2001))). Although questions of intent will not always preclude summary judgment, "caution must be exercised" when there are disputes over a state of mind. *Olem Shoe Corp. v. Washington Shoe Co.*, No. 09-

23494-CIV, 2011 WL 6202282, at *22 (S.D. Fla. Dec. 1, 2011), aff'd sub nom. *Olem Shoe Corp.*

*v. Washington Shoe Corp.*, 591 F. App'x 873 (11th Cir. 2015).

At bottom, despite the strong evidence supporting Plaintiff's theory, enough facts and inferences fall in Defendants' favor which create (but barely) a question about whether there has been any type of fraud, injustice, or improper purpose. This precludes summary judgment under either Florida or Delaware law.

The same standard which requires denial of Plaintiff's summary judgment request also compels denial of Defendants' summary judgment request. When viewing the facts and resolving all inferences in favor of Plaintiff (i.e., when assessing Defendants' summary judgment motion), the facts -- and the inferences that flow from them -- establish all the previously-mentioned facts, along with the following facts:

(1) Allen purposely obfuscated the Greenwalds' involvement during the NBV Loan Acquisition so that he could obtain a better deal and price;

(2) Allen used NBV Loan money to pay for his personal legal expenses;

(3) Allen knew that there was a likelihood that NBV Loan would receive zero damages, which would activate the PFS; and

(4) Allen caused NBV Loan to void the Greenwalds' debt to prevent creditors from being able to access it (and Regions was the only potential creditor when this occurred).

With these additional facts, there is an even-stronger case for finding in *Plaintiff's* favor on Count I. Defendants' arguments in support of granting summary judgment in its favor attempt to isolate many of the factors which the Court may consider and argue

48

that *individually* those factors are insufficient. [ECF No. 132, pp. 14 ("Certainly, the fact that Allen may have been the sole member of NBV Member itself, as a matter of law, does not support piercing the corporate veil."); 15 ("[T]he alleged failure to observe corporate formalities alone is not enough."); 16 ("Assuming, *arguendo*, without admitting this fact is true, Allen's non-disclosure of his identity as the member of NBV Member (as the sole member of NBV Loan) was not improper as a matter of law.")]. However, these factors are not examined in a vacuum; the court must consider *all* of Allen, NBV Member, and NBV Loan's actions in determining whether it is appropriate to pierce the corporate veil.

Given that the evidence has become only more compelling for Plaintiffs, *Defendants'* request for summary judgment must be denied. Indeed, if these facts fell in Plaintiff's favor during its own request for summary judgment, then Plaintiff would likely be entitled to summary judgment. *See Eckhardt v. United States*, 463 F. App'x 852, 857 (11th Cir. 2012) (affirming grant of summary judgment when the evidence established that defendant dominated and controlled company, improperly used corporate funds for personal benefit, and evaded employment taxes); *Venn v. Grizzle*, No. 3:17CV818-MCR/EMT, 2019 WL 1440905, at *2 (N.D. Fla. Mar. 31, 2019) (granting plaintiff's summary judgment motion when evidence established the defendant dominated and controlled company, observed only most basic corporate formalities, and operated a Ponzi scheme).

In summary, the Undersigned **respectfully recommends** that the District Court **deny** both Plaintiff's and Defendants' motions for summary judgment on Count I, as material facts are in dispute.

**B.    Count XV (Actual Fraudulent Transfer against Allen, Scott, Amy, and Billy's Creek on NBV-Greenwald Release)**

Both Plaintiff and Defendants contend that they are entitled to summary judgment on Count XV. Plaintiff claims that eight "badges of fraud" exist and "NBV [Loan] released its most valuable assets to hinder, defraud and delay Regions from collecting on the eventual judgment debt." [ECF No. 135]. In their own affirmative motion, Defendants argue that there are multiple reasons why the evidence supports summary judgment in their favor: (1) the NBV-Greenwald Release does not qualify as a fraudulent transfer because no asset was transferred; (2) the NBV-Greenwald Release could not have been made with the actual intent to delay, hinder, and defraud Regions; and (3) Regions must prove that the loans were NBV Loan's property and it has always been Regions' position that NBV Loan never owned, held, or controlled any assets.

"The elements for a cause of action for actual fraudulent conveyance under [the Florida Fraudulent Transfer Act, Fla. Stat. § 726.105(a)] are: (1) that a transfer of property occurred, (2) that the property was that of the debtor, and (3) that the debtor, had, at the time of the transfer, the intent to hinder, delay or defraud present or future creditors." *Martinez v. Majestic Farms, LLC*, No. 05-60833-CIV, 2006 WL 8431632, at *2 (S.D. Fla. Sept. 20, 2006). In determining the transferor's intent, the Court should examine the following

factors:

    (a) The transfer or obligation was to an insider;

    (b) The debtor retained possession or control of the property transferred after the transfer;

    (c) The transfer or obligation was disclosed or concealed;

    (d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (e) The transfer was of substantially all the debtor's assets;

    (f) The debtor absconded;

    (g) The debtor removed or concealed assets;

    (h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    (i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    (j) The transfer occurred shortly before or shortly after a substantial debt was incurred;

    (k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fla. Stat. § 726.105.

Courts refer to these factors as "badges of fraud." *Myers v. Brook*, 708 So. 2d 607, 610 (Fla. 2d DCA 1998). Typically, a single badge of fraud is insufficient to support a finding that a conveyance was made with actual fraudulent intent. *Id.* However, when multiple badges of fraud exist, summary judgment *may* be appropriate. *See In re Bifani*,

580 F. App'x 740, 745 (11th Cir. 2014) (affirming bankruptcy court's order granting summary judgment based on four badges of fraud but noting that "in fraud cases, summary judgment is available only in **extraordinary** circumstances." (internal quotations omitted) (emphasis added)). As stated previously, Plaintiff contends that eight badges of fraud exist. For summary judgment purposes, however, only two "badges" warrant discussion.

In all cases cited by Plaintiff (and those found by the Undersigned) in which a court granted summary judgment on a fraudulent transfer claim, the court found that "before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit" or that "the transfer occurred shortly before or shortly after a substantial debt was incurred." *In re Bifani*, 580 F. App'x at 746 (the trial court found that the defendant was being sued at the time of the transfer and noted that the transfer occurred shortly before a scheduled status conference); *Plus 352, S.A. v. Giraud*, No. 8:19-CV-2164-WFJ-TGW, 2022 WL 911574, at *4 (M.D. Fla. Mar. 29, 2022) (granting summary judgment based on multiple badges of fraud, including that the debtors were threatened with a lawsuit); *Chase Bank USA, N.A. v. Jacucci*, No. 19-62318-CIV, 2021 WL 2689995, at *8 (S.D. Fla. Feb. 22, 2021) (granting summary judgment when debtor had been sued before the transfers were made); *TTT Foods Holding Co. LLC v. Namm*, No. 16-CV-81798, 2017 WL 2901329, at *15 (S.D. Fla. May 19, 2017), dismissed, No. 17-14827-AA, 2018 WL 2022607 (11th Cir. Mar. 16, 2018) (granting summary judgment when transfer occurred

shortly after the defendant incurred a substantial debt and after he had been sued).

Here, there are factual disputes which preclude the Undersigned from finding that either of these two badges of fraud exist or do not exist.

Plaintiff contends that serving the PFS on NBV Loan is akin to the "threat of a suit" because NBV Loan "consulted with its counsel in rejecting it." [ECF No. 135]. Plaintiff relies on a similar theory in support of its claim that NBV Loan knew it was about to incur substantial debt. As support, Plaintiff highlights trial testimony in which the Greenwalds discuss how preventing the debt from falling into the hands of creditors was part of the reason for the release. Plaintiff also claims that NBV Loan's flip-flopping damages theory is evidence that NBV Loan knew it had failed to prove damages and would soon be liable for attorney fees. *Id.*

Defendants, however, argue that it is ludicrous for NBV Loan to have thought that Region's $5,000 settlement offer would have been more than the damages it would be awarded after trial. As support for this belief, Defendants note that NBV Loan had already received a favorable partial summary judgment ruling on liability and had settled similar claims against the Bank Group for $825,000. [ECF No. 145]. Thus, the PFS hardly amounted to the "threat of a suit." Moreover, Defendants contend that NBV Loan expected to receive a favorable damages verdict and the releases were executed nine months before the no-damages judgment was entered, which was when the debt was actually incurred. *Id.*

Plaintiff's version of the facts is certainly plausible and may well carry the day during a trial on these issues. But Defendants' version of the facts (and argued inferences) is not fantastical (i.e., it is not unreasonable for a plaintiff who received an $825,000 settlement to think that he would receive more than $5,000 in damages). Thus, because there is a factual dispute impacting the resolution of these two factors and because one is found in every cited case in which summary judgment has been granted on this offense, Plaintiff is not entitled to summary judgment.

Defendants' summary judgment argument ignores the badges of fraud (they fail to address the badges in their initial motion and address them only in their reply). Instead, Defendants claim that certain facts establish that the notes are not assets for purposes of a fraudulent transfer and that Plaintiff's entire argument is premised on a belief that NBV Loan had no assets, which means that it cannot prevail on this claim.

In support of their argument that Plaintiff has taken the position that NBV Loan had no assets, Defendants cite to piecemeal portions of Barry Mukamal's expert report and deposition testimony. Defendants argue that Mukamal testified "that NBV Loan had no assets that it owned or controlled at all relevant times." [ECF No. 132]. Defendants base this contention, in part, on a section of Mukamal's report, wherein he opines that "NBV [Loan] has never . . . owned any assets other than the Notes A & B, guarantees, and collateral" and on the following deposition exchange:

> Q. So from that point until the entry of the supplemental final judgment entered in favor of Regions for attorneys' fees against NBV Loan

Acquisition, it is your opinion that NBV Loan Acquisition never owned
anything and had no assets other than the FCB note, A and B, and ---
A. Well, you're calling it my opinion, but consider it more of a fact than an
opinion.

Defendants' cited evidence fails to support its contention. Contrary to Defendants'

position, it appears that Mukamal's deposition testimony reveals that he considers the

notes to be NBV Loan assets. Moreover, Defendants ignore the following exchange in

their analysis (in which Mukamal opines that NBV Member's assets were under the

control of NBV Loan by virtue of their common owner):

Q. NBV Loan had no control over its assets?
A. NBV --
Q. Loan.
A. -- Loan Acquisition had control of NBV Member's assets through a
common owner.

[ECF No. 133-17, p. 168:6-10]. Moreover, later on Mukamal reaffirmed his position

concerning the assets at issue in Count XV:

Q. So NBV Loan, other than Notes A and B, the collateral, as well as the
claims, the litigation claims, NBV Loan had no assets?
A. NBV Loan Acquisition --
Q. Right.
A. -- had guarantees and collateral assignments.
Q. Were the litigation claims also assets?
A. The litigation claims were contingent potential assets in their view.
Q. Okay. But at the time when NBV Loan acquires the loan facility from
FCB -- the notes and collateral and the guarantees -- it's also taking an
assignment and the purchase of the litigation claims?
A. Correct.
Q. But those claims are not assets, in your opinion?
A. Not assets that were able to pay, satisfy, any debts.

*Id.* at 168: 20-25; 169:1-13 (cleaned up).

Thus, in addition to Defendants' citations not supporting their sweeping claim that Plaintiff's expert has unequivocally opined that NBV Loan had no assets, uncited portions conclusively establish that Mukamal believed NBV Loan had control over NBV Member's assets due to their common owner. Therefore, Defendants' argument on this issue is not convincing for summary judgment purposes.

Next, Defendants say that the notes NBV Loan purchased from FCB matured on June 30, 2014, which began a five-year statute of limitations to enforce the notes under § 95.11, Florida Statutes. Because Plaintiff did not obtain its judgment until January 2020, Defendants claim that Plaintiff would never have been able to enforce the notes. Defendants provide no law which directly addresses this issue; instead, they rely on cases which generally state that a fraudulent transfer can occur only if the transferred asset could have been looked to by creditors and cases discussing the statute of limitations to enforce notes.

Plaintiff's response is three-fold: (1) Defendants have not pleaded a statute of limitations defense, which means it is waived; (2) § 726.109(3), Florida Statutes permits it to recover, regardless of the statute of limitations; and (3) NBV Loan extended the maturity dates. The Undersigned need not address the first counterargument because the second two counterarguments summarily dispose Defendants' contention.

As stated by *In re Davis*, 403 B.R. 914, 920 (Bankr. M.D. Fla. 2009),

[w]here a creditor elects to seek a judgment, "[i]f the judgment ... is based upon the value of the asset transferred, [it] must be for an amount equal to

the value of the asset at the time of the transfer, subject to adjustment as the equities may require." Fla. Stat. § 726.109(3). Reading these provisions together, it appears that creditors seeking relief under Chapter 726 may choose their remedy—either to avoid a transfer and seek recovery against the asset fraudulently transferred, or to receive a money judgment against the transferee based on the lesser of the value of the asset or the amount of the creditor's claim.

Thus, the statutory framework permits a plaintiff to recover the value of the asset at the time it was transferred (or, in this case, forgiven).

More importantly, however, there is a factual dispute. Plaintiff refers to credible evidence which supports a finding that the maturity date had been extended past June 13, 2014:

> Q: The principal and interest due on Note A was not paid on or before June 30 of 2014, correct?
> A. Correct, because that note was extended.
> Q. When was that note extended, Mr. Greenwald? This note was not extended. Where do you think it was extended?
> Q. When was promissory Note A extended, Mr. Greenwald? You don't know, do you, sir?
> A. When NBV [Loan] purchased the notes and when the notes were with FCB, a lot of these notes were extended later than the dates on the notes, and this note was extended when NBV [Loan] purchased it and extended the maturity.

[ECF No. 137-9, pp. 153:16-21, 154:1-7 (cleaned up)].

Accordingly, because there is a factual dispute and the law permits alternative forms of damages, Defendants are not entitled to summary judgment on this argument.

Finally, Defendants say that the notes were not transferred because it was a reduction of liability due to it being a release of debt, not a transfer of the notes to another

entity. Defendants cite only *In re Bal Harbour Quarzo, LLC*, 623 B.R. 903 (Bankr. S.D. Fla. 2020) -- which addresses an inapplicable scenario -- as support. The *In re Bal Harbour Quarzo* Court determined that a payment to another individual (who was sued separately and had the same transfer avoided) did not constitute a transfer to the defendant. The court rejected the plaintiff's contention that the transfer hypothetically reduced the defendant's liability (which the court said was not even supported by allegations) because it was based on an assumption that the defendant was liable to the other individual. This is markedly different than a forgiveness of debt by clear insiders.

Further, as Plaintiff correctly notes:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, *release*, lease, and creation of a lien or other encumbrance.

Fla. Stat. § 726.102 (emphasis added). Thus a "release" of debt is contemplated as a form of transfer. *See, e.g., Gen. Elec. Co. v. Chuly Int'l, LLC*, 118 So. 3d 325, 326 (Fla. 3d DCA 2013) (recognizing that loan forgiveness can be a fraudulent transfer).

At bottom, this claim concerns the forgiveness of debt, which qualifies as an asset transfer. The disputes over whether the claim can proceed are all based on facts which are also in dispute. For these reasons, the Undersigned **respectfully recommends** that the District Court **deny** both parties' request for summary judgment on this count.

### C.     Count XVII (Claim Against Billy's Creek for Actual Fraudulent Transfer)

This is the final count on which both Plaintiff and Defendants argue that they are

entitled to summary judgment. Plaintiff's position as to why it is entitled to summary judgment on this count (as well as Defendants' response to Plaintiff's position) is identical to its arguments concerning Count XV, except that Plaintiff says only six badges of fraud exist (as opposed to the eight which exist for Count XV). The Undersigned rejects Plaintiff's argument as to this count for the same reason Plaintiff's Count XV arguments were rejected.

Likewise, Defendants' arguments in support of their own request for summary judgment, although based on slightly different factual circumstances, are functionally identical to their arguments in support of their request for summary judgment on Count XV. The Undersigned rejects those arguments for the same reasons they were rejected previously (i.e., there are material factual disputes and the claim does not suffer from any statutory deficiencies).

Therefore, the Undersigned **respectfully recommends** that the District Court **deny** both Plaintiff and Defendants' request for summary judgment on Count XVII.

### D.    Counts II, III, V-VIII, IX-XI, and XVII (Whether Plaintiff has Taken the Position that NBV Loan Never Owned, Held, or Controlled any Assets)

Defendants claim that they are entitled to summary judgment on each of these counts because Plaintiff and its expert, Mukamal, have taken the position that NBV Loan had no assets other than the Greenwald loans. This argument is similar to Defendants' response to Plaintiff's summary judgment argument on Count XV and its own request for summary judgment on that count. As explained below, the "control" test allows for a

broader definition of "ownership" than Defendants propose is required.

The Eleventh Circuit employs the following reasoning when determining whether an asset is subject to avoidance:

> The purpose of avoidance of both types of transfers is to prevent a debtor from diminishing, to the detriment of some or all creditors, funds that are generally available for distribution to creditors. Consequently, any funds under the control of the debtor, regardless of the source, are properly deemed to be the debtor's property, and any transfers that diminish that property are subject to avoidance.

*In re Chase & Sanborn Corp.*, 813 F.2d 1177, 1181 (11th Cir. 1987).

The control test is a "very flexible, pragmatic one." *In re McMillin*, 482 F. App'x 454, 457 (11th Cir. 2012) (quoting *Nordberg v. Societe Generale*, 848 F.2d 1196, 1199 (11th Cir. 1988). When applying this standard, "courts [] consider[] the source of the funds, which party primarily benefits from the challenged transactions, and whether the debtor has the power to designate which party will receive the funds and the power to actually disburse the funds." *Id.*

Defendants concede that NBV Member was the sole member of NBV Loan and that Allen was the sole member of NBV Member. There is also testimony that, in the Greenwalds' opinion, NBV Loan and NBV Member were the same entity. Finally, there is no question that these transfers exclusively benefited the Greenwalds' interests.

Further, Defendants' argument -- that Mukamal opined that "NBV Loan has no assets that it owned or controlled at all relevant times" -- continues to ignore Mukamal's testimony that NBV Loan had control of NBV Member through a common owner.

Further, although Defendants refer to a quote from Mukamal's deposition in which he admits that NBV Loan and NBV Member are "two separate entities," they leave out the remainder of the same sentence wherein Mukamal continues by stating that "[NBV Member] was used for the benefit of NBV Loan."

There is ample evidence which would support Plaintiff's claims based on an application of the control test. Defendants' selected, isolated quotations from depositions -- divorced from the context in which they were made -- are insufficient to warrant summary judgment on this ground.

> **E.     Counts III, VI, IX, and XI (Whether NBV Loan was at All Times an Undercapitalized Shell)**

Defendants claim that summary judgment in their favor on these counts is appropriate because Plaintiff has taken the position that NBV Loan was, at all times, a shell and undercapitalized, which means that these "transfers could not cause NBV Loan's alleged unreasonably small capital or inability to pay its debts as they came due."

This argument misstates the record: Plaintiff's theory argues that NBV Loan was at all times undercapitalized because the moment NBV Loan received an influx of cash, it immediately transferred out the cash, which left it with minimal assets to pay its debts as they became due. For example, when NBV Loan received more than $500,000 (directed to NBV Member's bank account) from the settlement with the Bank Group, the money was transferred out within a few days. Similarly, when NBV Loan was repaid for the DIP Loan, it transferred the money out to Greenwald interests within a few days.

In summary, it is the near-contemporaneous transfers that repeatedly left NBV Loan with minimal available cash. The cases cited by Defendants do not require a different finding. For example, Defendants rely on the following opinion as support:

> Under both federal and Florida law, there must be a causal relationship between the Transfers and the likelihood that the Debtor's business will fail. The Plaintiff argued that the existence of the Stewart Litigation and the entry of the Stewart Judgment resulted in the inevitable failure of the Debtor. If the Debtor's failure was caused by the Stewart Judgment it was not caused by the Transfers. If a debtor is doomed to fail prior to a transfer, the transfer does not create the likelihood of such failure, and the statutory test is not satisfied. *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992). A debtor's later failure, alone, is not dispositive on this issue. The Court's analysis must be done as of the time of the transfers in question. [*Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073–74 (3d Cir. 1992)]; [*Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009)]

[ECF No. 132 (quoting *In re Kane & Kane*, No. 09-15556-EPK, 2013 WL 1197609, at *10 (Bankr. S.D. Fla. Mar. 25, 2013)]. Defendants ignore the actual meaning of this opinion by neglecting to include that the *In re Kane & Kane* court rejected the plaintiff's fraudulent transfer theory because the debtor was not left with unreasonably small capital after any of the transfers.

Here, despite receiving multiple payments of more than $500,000.00, NBV Member's bank account only exceeded a $10,000.00 monthly balance for seven out of 51 months. All the while, NBV Loan was involved in active litigation which, after the service of the PFS, could have resulted in it becoming liable for Regions' attorney fees (which were certainly going to exceed $10,000.00).

As articulated by *Wells Fargo Bank, N.A. v. Barber*, 85 F. Supp. 3d 1308, 1317 (M.D. Fla. 2015), the proper inquiry is whether "the debtor did not receive reasonable value for the transfer and either (1) the debtor was engaged or was about to engage in a business or transaction for which the debtor's remaining assets were unreasonably small in relation, (2) the debtor intended to, believed, or reasonably should have believed that she would incur debt beyond what she could pay as the debt became due, or (3) the debtor was insolvent at the time of the transfer."

NBV Loan's ability to pay its debts was due only to the influx of money from the Greenwalds, which was barely enough to cover them. Although the outside influx of money from the Bank Group Settlement and the repayment of the DIP Loan could have left NBV Loan without a need to depend on the Greenwalds' generosity to pay its debts, the immediate disbursement of these funds meant that NBV Loan never had consistently sufficient funds to support its litigation.

Accordingly, because NBV Member's near-instantaneous disbursement of any incoming money left it with a habitually miniscule bank balance, summary judgment in Defendants' favor is not warranted on this ground.

### F.      Counts III, VI, IX, and XI (Renewing Previous Arguments)

Defendants argue that summary judgment in their favor is appropriate on these counts "for the reasons stated in the Court's order dismissing the constructive fraud counts against the corporate defendants." Defendants fail to actually elaborate on this

argument, as they only "hereby renew[ed] their Motion for Judgment on the Pleading [sic] which they incorporate herein by reference . . . ." The Undersigned will not consider a substantive argument "incorporated by reference."

Incorporating other documents by reference is nothing more than an indirect way to avoid (the already-increased) page limitation set by the Court for summary judgment motions. *See Happy Tax Franchising, LLC*, 2021 WL 3811041, at *3 (refusing to consider arguments incorporated by reference because such arguments attempt to avoid the page limits set by the courts); *Lane v. United States*, 338 F. Supp. 3d 1324, 1341 n.12 (S.D. Ga. 2018) (same). District courts through this Circuit have similarly refused to consider arguments raised in this fashion, noting the impropriety of the tactic and the burden it places on the court:

> The parties purport to "incorporate" all or portions of prior briefs on prior motions into their present briefs on the instant motions. By local rule, principal briefs cannot exceed 30 pages, and reply briefs cannot exceed 15 pages. Local Rule 7.1(b). The parties are fully aware of this rule, since SEPH sought leave to file a 34–page principal brief and the plaintiff sought leave to file a 19–page reply brief. Neither sought leave to further exceed the page limits by incorporating previous briefing. "[W]hen a party incorporates by reference an entire section of another brief, ... the incorporated section should count against" the page limits established by local rule. *Bryant v. Jones*, 2006 WL 584762 at *6 (N.D. Ga. 2006). The parties' tactic "is improper and foists upon the Court the burden of sifting through irrelevant materials to find the materials referenced while permitting the movant to circumvent this Court's page limit." *Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 1253 (M.D. Fla. 2012). Like its sister courts, the Court "will not countenance any attempt to avoid the page limit requirement of the Local Rules." *Id.* The materials purportedly incorporated are not before the Court and will not be considered in resolving the instant motions.

*FNB Bank v. Park Nat. Corp.*, No. CIV.A. 13-0064-WS-C, 2013 WL 6842778, at *1 (S.D. Ala. Dec. 27, 2013).

Defendants' Motion for Judgment on the Pleadings is an independent, ten-page legal memoranda. [ECF No. 52]. If the Undersigned were to consider this argument, then it would effectively provide Defendants with an additional ten pages to the already-increased summary judgment page limitation. The Court will not permit this attempt to circumvent the Court's rules.

Accordingly, the Undersigned will not consider this argument as a basis to recommend granting Defendants' summary judgment motion on these counts.

### G.     Counts II, IV, V, VII, VII, X, XII, and XVII (Whether the Transfers were Intended to Hinder a Creditor)

Defendants next claim that Plaintiff's actual fraudulent transfer claims must fail because Plaintiff cannot show that these transfers were made with the intent to hinder a creditor. Defendants claim that it is "objectively implausible that NBV Loan would have been concerned over possible exposure for attorney's fees at the time the transfers were made . . . ." Plaintiff argues in response that the Court must examine the badges of fraud when assessing the intent of a transferor.

The Undersigned disagrees with Defendants' contention that such a motive is objectively implausible. After being served with the PFS, it became possible that Plaintiff could become a creditor and there is evidence which supports NBV Loan's knowledge of

this possibility. Moreover, while there is evidence that supports a theory that NBV Loan did not actually fear this possibility of attorney's fees morphing into a reality, there is also evidence which would support a finding that NBV Loan had very real reasons to worry that this possibility could occur.

Said differently, there is a dispute of material fact. Accordingly, summary judgment on this ground is unwarranted.

### H.    Count XIX (Civil Conspiracy)

Finally, Defendants ask for summary judgment on Plaintiff's civil conspiracy count. Defendants contend that there are multiple grounds which support granting summary judgment in their favor on this count. First, Defendants claim that the intracorporate conspiracy doctrine defeats Plaintiff's claim. Second, Defendants argue that Billy's Creek cannot be a conspirator because it was not a transferee. Finally, Defendants say that because conspiracy is a derivative claim of the underlying claim and the underlying claims are not actionable, then this count is also not actionable.

The Undersigned has already rejected Defendants' claims that the underlying torts are not actionable. Thus, this argument must fail as a justification for summary judgment on this issue. Because of this, I will address only Defendants' other two arguments.

"[U]nder Florida common law, a civil conspiracy requires: (1) an agreement between two or more parties, (2) to do an unlawful act or to do a lawful act by unlawful means, (3) the doing of some overt act in pursuance of the conspiracy, and (4) damage to

plaintiff as a result of the acts done under the conspiracy." *Helinautica Int'l, S.A. v. Engage Aviation LLC*, No. 8:11-CV-676-T-17TGW, 2011 WL 5553896, at *3 (M.D. Fla. Nov. 15, 2011). According to the intracorporate conspiracy doctrine, because a corporation can only act through its corporate agents, the corporation cannot conspire with itself, and "[g]enerally speaking, neither an agent nor an employee can conspire with his or her corporate principal or employer." *Lipsia v. Ramlawi*, 760 So. 2d 170, 180 (Fla. 3d DCA 2000); *see also McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1037 (11th Cir. 2000) ("[I]t is not legally possible . . . for a single legal entity consisting of the corporation and its agents to conspire with itself.").

Defendants aver that Scott and Amy are "clearly agents or principals of Billy's Creek," which means that they cannot conspire with Billy's Creek. Plaintiff counters that two theories support a rejection of this argument. First, Plaintiff notes that the doctrine is inapplicable because "NBV [Loan] was owned and controlled by Allen and is separate from Billy's Creek, controlled by Scott," which means "the conspiracy involved third parties." [ECF No. 148]. Second, Plaintiff argues that the doctrine does not apply when "an agent has a personal stake in the activities separate from the principal's interest." *Id.* (quoting *Helinautica Int'l, S.A.*, 2011 WL 5553896, at *3).

Defendants argue that the first exception cannot apply because Plaintiff has alleged that "Allen, Amy, Scott, and Billy's Creek are all 'insiders' of NBV Loan with sufficient control." [ECF No. 157 (citing Plaintiff's Summary Judgment Motion)].

However, this misstates Plaintiff's argument concerning insiders (which at no point alleges that anybody other than Allen exercised "control" over NBV Loan). Indeed, the law makes clear that the definition of an insider is far more expansive than the definition of an agent. *Compare Plus 352, S.A.*, 2022 WL 911574, at *3 (an insider includes the relatives of debtors or directors or a corporation if the debtor is a corporation, "close relationship[s] between a transferor debtor and a transferee," and "close business relationships") *with Garrido v. Burger King Corp.*, 558 So. 2d 79, 81 (Fla. 3d DCA 1990) (equating an "agent" to a corporation's "directors, officers or employees"); *see also HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 302 F. Supp. 3d 1319, 1325 (M.D. Fla. 2016), aff'd, 703 F. App'x 814 (11th Cir. 2017) (recognizing that the intracorporate conspiracy doctrine exists "because the actions of corporate agents, acting within the scope of their employment, are attributed to the corporation itself, thereby negating the multiplicity of actors needed for a conspiracy").

Thus, although the fact that Amy and Scott are relatives of Allen may qualify them as insiders, it does not mean that they are *de facto* agents or exercise any control over NBV Loan. Therefore, because the conspiracy includes co-conspirators which extend beyond a single corporation and its agents, the intracorporate conspiracy doctrine does not apply. And since the intracorporate conspiracy doctrine does not apply, there is no need to address whether any properly categorized agents had a personal stake in the activity.

Defendants next argue that Billy's Creek cannot be a conspirator because the

Billy's Creek mortgage was satisfied in September 2018, well before the NBV-Greenwald Release, which means that Billy's Creek cannot be deemed a "transferee" of the NBV-Greenwald Release. Plaintiff's response argument is simple: "Defendants ignore that the conspiracy claim *includes* the Billy's Creek Satisfaction, of which Billy's Creek was the transferee." Defendants do not acknowledge this response in their reply and fail to explain how Billy's Creek does not qualify as a transferee of the Billy's Creek Satisfaction, which is an act included in the conspiracy. Accordingly, this argument is also without merit.

In summary, Defendants' motion for summary judgment should also be denied as to Count XIX.

## IV.     Conclusion

Because there are multiple material facts in dispute, The Undersigned **respectfully recommends** that the District Court **deny** both Plaintiff's and Defendants' summary judgment motions.

## V.     Objections

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within 14 days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the

parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, Miami, Florida, on December 1, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Federico A. Moreno
All counsel of record